

DA 06-0724

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 9

BONNER SCHOOL DISTRICT NO. 14,

        Petitioner and Appellee,

   v.

BONNER EDUCATION ASSOCIATION,
MEA-MFT, NEA, AFT, AFL-CIO,

        Respondents and Appellants.

APPEAL FROM:    District Court of the First Judicial District,
                    In and For the County of Lewis and Clark, Cause No. ADV-2005-719
                    Honorable Dorothy McCarter, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

                Karl J. Englund (argued), Attorney at Law, Missoula, Montana

        For Appellee:

                Debra A. Silk (argued) and Tony C. Koenig, Montana School Boards
                Association, Helena, Montana

                              Argued and Submitted: September 5, 2007

                                        Decided: January 15, 2008

Filed:

                               _____
                                       Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1    The Bonner Education Association (BEA) appeals from an order of the First Judicial District, Lewis and Clark County, granting the Bonner School District No. 14's (District) motion for summary judgment. We reverse.

¶2    BEA presents the following issues for review:

¶3    Whether the District Court properly determined that teacher transfers and assignments are not mandatory subjects of bargaining under Montana's Collective Bargaining for Public Employees Act.

¶4    Whether the District Court properly determined that the management rights clause of the collective bargaining agreement protected the District from an unfair labor practice claim when it transferred teachers without bargaining.

¶5    Whether the District Court properly remanded to the Hearings Officer the question of whether a long-standing practice should be treated as an express provision of a collective bargaining agreement.

## PROCEDURAL AND FACTUAL BACKGROUND

¶6    The District hired a new superintendent, Doug Ardiana (Ardiana), between the 2002-2003 and 2003-2004 school years. Ardiana and BEA president Julie Foley (Foley) met to discuss Ardiana's administrative plans before the start of the 2003-2004 school year. Ardiana informed Foley that he had reassigned teachers in other school districts in which he had worked, and that he would consider doing so in Bonner as he thought necessary to meet the needs of the District. The District involuntarily transferred and reassigned several teachers at Ardiana's direction during the 2003-2004 school year.

2

¶7 The transfers and reassignments affected the subjects taught and the teachers' areas of expertise. The District had not involuntarily transferred or reassigned teachers within the previous ten years. BEA responded on April 14, 2004, by filing an unfair labor practice claim with the Board of Personnel Appeals (Board). BEA alleged that the District improperly had refused to bargain for the transfers and reassignments. BEA alleged that the District violated §§ 39-31-401 and 39-31-305(2) MCA, by refusing to bargain in good faith with respect to a condition of employment.

¶8 BEA and the District were parties to a collective bargaining agreement (CBA) at the time. The term of the CBA ran from July 1, 2002, through June 30, 2004. The CBA did not specifically provide procedures for teacher transfers and reassignments. The CBA did include a management rights clause that recognized the School Board's prerogative to manage the school district, "except as limited by explicit terms of [the CBA]."

¶9 The Board conducted a hearing to determine whether Montana law or the terms of the CBA required the District to bargain in good faith for the transfers. The Board considered both the explicit statutory management right to "hire, promote, transfer, assign, and retain employees . . . ," provided in § 39-31-303(2), MCA, and the statutory duty to bargain in good faith for conditions of employment, provided in § 39-31-305(2), MCA. The Board determined that involuntary teacher transfers constituted mandatory subjects of bargaining as conditions of employment and as conditions that "can have a great impact on the well-being of an individual teacher," citing its own decision in *Florence-Carlton Unit v. Board of Trustees of School District No. 15-6* (1979), ULP 5-77.

3

¶10 The Board also considered whether the CBA allowed the District to make involuntary teacher transfers and reassignments. The District asserted that the CBA's management rights clause provided express authorization. The clause recognized the School Board's "prerogative[] . . . to operate and manage the school district and retain, without limitation, all powers, rights, authority, duties and responsibilities conferred upon and vested in it by law. . . ." The District claimed that this portion of the CBA expressly incorporated the statutory management rights set forth in § 39-31-303(2), MCA.

¶11 The Board rejected this interpretation of the CBA. The Board concluded that such a broad interpretation of management rights necessarily would defeat other express provisions of the CBA regarding teacher choice in staffing and hiring decisions. Moreover, the Board found the CBA to be ambiguous as to the parties' intent to incorporate the statutory management right. The Board also concluded that a teacher's right to continue teaching a subject or a grade represented a "professional advantage" explicitly preserved and protected under the CBA.

¶12 The Board finally determined that the CBA's integration clause and the management rights clause did not constitute a waiver of BEA's right to bargain for transfers and reassignments. The Board applied a federal interpretative scheme that considered the parties' past bargaining history and the absence of an express waiver of BEA's right in the CBA. The Board determined that the parties past bargaining practice of not addressing transfers and reassignments and the absence of an express waiver preserved BEA's right to bargain for transfers and reassignments in the CBA. The Board therefore concluded that the

4

District committed an unfair labor practice when it transferred or reassigned teachers without bargaining with BEA.

¶13 The District petitioned the District Court for judicial review. Both parties moved for summary judgment. The District Court determined that the statutory management right contained in § 39-31-303, MCA, expressly reserved to the District the right to transfer or assign involuntarily as evidenced by management's "prerogative[] . . . [to] hire, promote, transfer, assign, and retain employees . . . ." The District Court concluded that only "other working" conditions not expressly listed under § 39-31-303, MCA, represented mandatory subjects of collective bargaining.

¶14 The District Court also determined that the CBA's management rights clause and the statutory management right authorized the District to transfer and assign unilaterally absent an express provision requiring bargaining for teacher transfers. The District Court declined to consider whether BEA had waived its right to bargain for transfers and assignments in light of its decision that the transfers and assignments fell within the District's management rights. Finally, the District Court remanded to the hearing examiner the question of whether the District's long-standing practice of not making unilateral transfers without bargaining should be treated as though it constituted an express term of the CBA. BEA appeals.

## STANDARD OF REVIEW

¶15 A district court reviews an administrative agency's findings of fact to determine whether they are clearly erroneous in view of the reliable, probative, and substantial evidence

5

in the whole record. A district court will uphold an agency's conclusion of law if the agency's interpretation of the law is correct. We in turn employ the same standards when reviewing a district court's decision. *Roos v. Kircher Public School Bd.*, 2004 MT 48, ¶ 7, 320 Mont. 128, ¶ 7, 86 P.3d 39, ¶ 7. The interpretation of a collective bargaining agreement provision presents a question of law that this Court reviews to determine if it is correct. *Hughes v. Blankenship*, 266 Mont. 150, 154, 879 P.2d 685, 687 (1994).

**DISCUSSION**

¶16 *Whether the District Court properly determined that teacher transfers and assignments are not mandatory subjects of bargaining under Montana's Collective Bargaining for Public Employees Act.*

¶17 Section 39-31-305(2), MCA, obligates a public employer to bargain "in good faith with respect to wages, hours, fringe benefits, and other conditions of employment . . . ." This mandate is virtually identical to the collective bargaining mandate in title 29, section 158(d) of the United States Code, a section of the federal National Labor Relations Act (NLRA). Section 158(d) provides that the parties must negotiate "in good faith with respect to wages, hours, and other terms and conditions of employment . . . ." 29 U.S.C. § 158(d). An employer commits an unfair labor practice under § 39-31-401(5), MCA, if it refuses to negotiate in good faith on any of these subjects. Neither the Montana Collective Bargaining for Public Employees Act, nor the NLRA defines "other conditions of employment." We have not had the opportunity yet to examine the scope of "other conditions of employment."

6

¶18 This Court has looked previously to federal courts' construction of the NLRA as an aid to interpretation of the Montana Public Employees Collective Bargaining Act. *Small v. McRae*, 200 Mont 497, 502, 651 P.2d 982, 985 (1982) (citing *State, Dept of Hwys. v. Public Employees Craft Coun.*, 165 Mont. 349, 529 P.2d 785 (1974). The similarity between § 39-31-305(2), MCA, and 29 U.S.C. § 158(d), and the fact that we have not yet explored the scope of "other conditions of employment," leads us to look to these federal decisions for instruction.

¶19 The U.S. Supreme Court and the National Labor Relations Board (NLRB) have construed conditions of employment broadly for purposes of the collective bargaining mandate. For example, the Court in *Fibreboard Corp. v. NLRB*, 379 U.S. 203, 209-16, 85 S. Ct. 398, 402-05 (1964), stated that the policy of fostering "industrial peace" represents a primary consideration when classifying a bargaining subject as a condition of employment under the NLRA. Similarly, the Court in *Ford Motor Co. v. NLRB*, 441 U.S. 488, 495, 99 S. Ct. 1842, 1848 (1979), pronounced that the courts must show deference to the NLRB's classifications of bargaining subjects as conditions of employment. In *Ford Motor Co.*, where the U.S. Supreme Court held that the setting of food prices for in-plant meals for employees constituted a condition of employment, it described conditions of employment as matters "plainly germane to the working environment," and "not among those managerial decisions which lie at the core of entrepreneurial control." *Ford Motor Co.*, 441 U.S. at 498, 99 S. ct. at 1850 (citing *Fibreboard Corp.*, 379 U.S. at 222-23, 85 S. Ct. at 409) (internal quotation marks omitted). Managerial decisions that "lie at the core of entrepreneurial control," as distinguished from conditions of employment, include those things related to the

7

"basic scope of the enterprise. . . ." *Fibreboard Corp.*, 379 U.S. at 223, 85 S. Ct. at 409 (Stewart, J. concurring).

¶20    The federal courts and the NLRB have determined that a diverse range of issues qualify as conditions of employment, and thus constitute mandatory bargaining subjects. The NLRB in *Pepsi-Cola Bottling Co. of Fayetteville*, 330 NLRB 900, 902-03 (2000), held that telephone access, break policies, and accounting for product shortfalls qualify as conditions of employment under the NLRA.  Free agency and reserve issues in professional baseball constitute conditions of employment under the NLRA.  *Silverman v. Major League Baseball Player Comm.*, 67 F.3d 1054, 1060-62 (2d Cir. 1995).  Rental rates for company houses also represent conditions of employment under the NLRA.  *American Smelting and Refining Co. v. NLRB*, 406 F.2d 552, 553-55 (9th Cir. 1969).

¶21    The federal courts and the NLRB, in early cases interpreting the scope of the NLRA, specifically have held that employee transfers constitute conditions of employment that must be bargained under the NLRA.  In *Rapid Roller Co. v. NLRB*, 126 F.2d 452, 457-60 (7th Cir. 1942), the court determined that transferring employees from department to department constituted a condition of employment that required collective bargaining.  The NLRB held in *In re U.S. Automatic Corp.*, 57 NLRB 124, 133-35 (1944), that even transfers of non-union employees presented proper subjects of mandatory collective bargaining.  And in *Inland Steel Co. v. NLRB*, 170 F.2d 247, 252-53 (7th Cir. 1948), the court determined that a related bargaining subject, seniority, posed a mandatory bargaining subject because requiring negotiation provides "protection of employees against arbitrary management conduct in connection with hire, promotion, demotion, *transfer* and discharge . . . ." (emphasis added).

8

¶22 We agree with those early federal NLRA decisions that employee transfers and reassignments, like those at issue in this case, constitute conditions of employment. The teacher transfers in Bonner were "plainly germane to the working environment," perhaps more plainly so than the in-plant meal prices for employees in *Ford Motor Co. Ford Motor Co.*, 441 U.S. at 498, 99 S. Ct. at 1850. The involuntarily transferred Bonner teachers experienced changes in the subjects they were expected to teach, the number of subjects they were expected to teach, and the abilities and special needs of the students they were expected to teach. The Board recognized the importance of a teacher's particular assignment. The Board noted the expertise that teachers acquire over years of teaching the same subject, the supplies and materials pertinent to each subject (sometimes purchased with their own funds), and the value of the continuing education unique to their particular subject or grade level.

¶23 The teacher transfers did not concern the "basic scope of the enterprise," and thus did not lie "at the core of entrepreneurial control." *Fibreboard Corp.*, 379 U.S. at 223, 85 S. Ct. at 409. The transfers did not concern the subjects being taught at the school. The transfers concerned who would teach those subjects. The transfers did not concern which grades were taught at the school. The transfers concerned who would teach those grades. The scope of the school's enterprise remained the same – educating students in grades kindergarten through eight. The conditions changed under which its employees were expected to work.

¶24 We hold that teacher transfers and reassignments constitute "other conditions of employment" as contemplated by § 39-31-305(2), MCA. This interpretation comports with the policy goals pronounced by the legislature in enacting the collective bargaining statutes. Section 39-31-101, MCA, articulates that the overarching policy behind the Collective

9

Bargaining for Public Employees Act encourages "the practice and procedure of collective bargaining to arrive at friendly adjustment of all disputes between public employers and the employees." This policy mirrors the U.S. Supreme Court's decision in *Fibreboard*, in which it held that fostering "industrial peace" must be a primary consideration in determining whether an issue constitutes a condition of employment under the NLRA. *Fibreboard Corp.*, 379 U.S. at 209-15, 85 S. Ct. at 402-06.

¶25   The District points out that the NLRA lacks a management rights provision that corresponds to § 39-31-303, MCA. The District argues that this omission precludes us from analogizing to federal law concerning topics deemed to be conditions of employment and therefore subject to mandatory collective bargaining. The Montana management rights provision recognizes, in pertinent part, the "prerogatives of public employers to operate and manage their affairs in such areas as, but not limited to . . . hire, promote, transfer, assign, and retain employees." Section 39-31-303(2), MCA. BEA acknowledges this distinction between Montana and federal law, but asserts nevertheless that federal court and NLRB decisions should guide our decision in light of the fact the U.S. Supreme Court has recognized an implicit and inherent right to manage existing in the NLRA.

¶26   BEA cites *First National Maintenance Corp. v. NLRB*, 452 U.S. 666, 101 S. Ct. 2573 (1981), as an example of the broad management rights recognized by federal courts. The Court held that management retains the right under the NLRA to manage "free from the constraints of the bargaining process to the extent essential for the running of a profitable business." *First National Maintenance*, 452 U.S. at 678-79, 101 S. Ct. at 2580-81. The Court concluded that the "employer's need for unencumbered decisionmaking" empowered

10

the employer to discharge a number of its employees without bargaining, notwithstanding the statutory duty. *First National Maintenance*, 452 U.S. at 679, 101 S. Ct. 2581.

¶27 A comparison of the implicit federal management right recognized by the federal courts with the explicit management right provided in § 39-31-303(2), MCA, reveals the undefined federal right to be more expansive. The federal management right contains no defined scope or outer limit. The federal courts nevertheless have determined that employers have a duty to bargain for employee transfers under the NLRA. *Rapid Roller Co.*, 126 F.2d at 457-60; *In re U.S. Automatic Corp.*, 57 NLRB at 133-35; *Inland Steel Co.*, 170 F.2d 252-53. The Montana management rights provision, on the other hand, discusses a "prerogative" rather than a "right," and defines the particular subjects to which it applies.

¶28 The District urges us to rely on federal authority interpreting management rights clauses in collective bargaining agreements that employ language similar to the language in § 39-31-303, MCA. The District contends that those cases consistently have determined that management rights clauses permit employers to exercise expressly reserved rights without first bargaining. The District argues that *Uforma/Shelby Business Forms, Inc. v. NLRB*, 111 F.3d 1284, 1290 (6th Cir. 1997), and *NLRB v. U.S. Postal Service*, 8 F.3d 832, 838 (D.C. Cir. 1993), should guide our decision. The District's reliance on *Uforma* and *U.S. Postal Service* falls short.

¶29 *Uforma* involved a waiver by the union. The union's express waiver of its right to bargain collectively by agreeing to "clear and unmistakable" language in the collective bargaining agreement sustained the *Uforma* court's conclusion. *Uforma*, 111 F.3d at 1290. The Court in *U.S. Postal Service* decided the case primarily on the basis of whether the union

11

had lost its right to bargain for a subject by previously agreeing to its inclusion in the management rights clause of a collective bargaining agreement. *U.S. Postal Service,* 8 F.3d at 836-38. The current controversy involves no similar bargaining or express waiver of rights.

¶30     Moreover, as a matter of statutory construction, the statutory management rights provision does not absolve public employers from their duty to bargain for employee transfers. The management rights provision refers to management's "prerogative[]" to "hire, promote, transfer, assign, and retain employees." Section 39-31-303(2), MCA. Both BEA and the District urge that we interpret "prerogative" according to the plain dictionary meaning of the term. Both rely on substantially similar definitions of prerogative as "an exclusive or special right, power or privilege."

¶31     The District contends that an exclusive right, power, or privilege means an unlimited right with regard to the subjects listed in the management rights provision regardless of the duty to bargain under § 39-31-305, MCA. The District argues that the provision absolves it of a duty to bargain for all subjects listed. BEA counters that the prerogative means the exclusive right to make a final decision in the matter. BEA points out that this right to decide remains intact whether the statute requires the employer to bargain. BEA asserts that a bargaining mandate only obligates the employer to meet with the employees' representative and negotiate in good faith. The statute mandates the process. It requires management to concede nothing. We agree.

¶32     Such an interpretation avoids unnecessary conflict between the two statutes. It also serves both the practical necessity for management rights and the stated purpose of the

12

Montana Collective Bargaining for Public Employees Act "to encourage the practice and procedure of collective bargaining to arrive at friendly adjustment of all disputes between public employers and their employees." Section 39-31-101, MCA. In light of our determination that § 39-31-305(2), MCA, requires the District to bargain regarding teacher transfers, we hold that the District Court improperly determined that the District was not required to bargain for teacher transfers and reassignments under the Montana Collective Bargaining for Public Employees Act.

¶33 *Whether the District Court properly determined that the management-rights clause of the collective bargaining agreement between the District and BEA protected the District from an unfair labor practice claim when it transferred teachers without bargaining.*

¶34 The rules of contract construction guide us in determining whether the CBA permitted the District to transfer teachers without bargaining. *See e.g. Kuhr v. City of Billings*, 2007 MT 201, ¶ 18, 338 Mont. 402, ¶ 18, 168 P.3d 615, ¶ 18. We long have recognized, however, the importance of promoting "the practice and procedure of collective bargaining to arrive at friendly adjustment of all disputes between public employers and their employees." *Small*, 200 Mont. at 502, 651 P.2d at 987 (citing § 39-31-101, MCA). This same policy animates federal labor law. This Court previously has looked to federal courts for guidance in interpreting collective bargaining agreements. *Small*, 200 Mont. at 502, 651 P.2d at 985. "[R]efusals to confer and negotiate had been one of the most prolific causes of industrial strife" before the advent of modern labor principles. *Fibreboard Corp.*, 379 U.S. at 211, 85 S. Ct. at 403. This overarching policy goal also guides our consideration of the CBA.

13

¶35 The District argues that the CBA's management rights provision explicitly provides the District with authority to make unilateral teacher transfers without bargaining. This provision, Article IV, § 4.1 of the CBA, provides as follows:

> [BEA] recognizes the prerogatives of the [District] to operate and manage the school district and retain, without limitation all powers, rights, authority, duties and responsibilities conferred upon and vested in it by law, except as limited by explicit terms of this agreement.

The District contends that the prerogatives recognized in this provision necessarily must include the right to transfer because it is not "limited by explicit terms" elsewhere in the CBA. The District further argues that the provision will be rendered meaningless unless we interpret the provision in this way. The District contends that our failure to apply this interpretation would violate the rule of contract construction that provides that "[t]he whole of a contract is to be taken together so as to give effect to every part if reasonably practicable . . . ." Section 28-3-202, MCA.

¶36 Reading the CBA as a whole, however, reveals that two other clauses figure prominently. The CBA contains an integration clause, commonly known as a "zipper clause," that provides that the parties have subsumed all agreements into the CBA. *International Union v. Murata Erie North America*, 980 F.2d 889, 903 (3rd Cir. 1992). A union that agrees to a zipper clause generally waives its right to bargain for otherwise mandatory subjects of bargaining that might not be included in the agreement. *International Union*, 980 F.2d at 903.

¶37 The zipper clause provides:

> [The CBA constitutes] the full and complete [a]greement between the [District] and the BEA. The provisions herein relating to salary, hours, and

other terms and conditions of employment supersede any and all prior agreements, resolutions, practices, rules or regulations concerning salary, hours, and other terms and conditions of employment inconsistent with these provisions.

The clause, read in isolation, could be interpreted to waive BEA's statutory right to bargain for teacher transfers and assignments as terms and conditions of employment. *International Union*, 980 F.2d at 903. We do not read a particular clause in isolation, however, as we must interpret the CBA as a whole. Section 28-3-202, MCA.

¶38 The CBA also contains a professional advantages clause. The clause provides that the CBA "shall not be interpreted to deprive teachers of professional advantages heretofore enjoyed, however, this does not incorporate these advantages into this contract." The Board determined that "the ability to continue to teach in a subject or grade of a member's choice" constitutes a professional advantage protected under that clause. We have not yet had an opportunity to interpret the scope of a professional advantages clause. Other jurisdictions have interpreted a professional advantages clause as a condition that would "increase [a teacher's] employability" in his field, and a condition that would "aid [a teacher] in getting and retaining subsequent employment in [the] teaching profession." *E.g. Westbrook Sch. v. Westbrook Tchrs. Ass'n*, 404 A.2d 204, 212 (Me. 1979).

¶39 We must interpret the CBA in a manner that "give[s] effect to every part if reasonably practicable . . . ." Section 28-3-202, MCA. We noted above that transfers and reassignments constitute conditions of employment, in part, because of the expertise teachers acquire over years of teaching the same subject, and the value of the continuing education unique to their particular subject or grade level. ¶ 22. Expertise and education represent conditions that

15

could increase employability or aid "in getting and retaining subsequent employment in the teaching profession." *Westbrook Sch.*, 404 A.2d at 212. The CBA's professional advantages clause could be interpreted to protect teachers from involuntary teacher transfers and reassignments.

¶40    The zipper clause and the professional advantages clause in the CBA present us with conflicting provisions. The zipper clause has the general effect of waiving mandatory bargaining subjects not specifically contained in the CBA. In particular, it supersedes past practices concerning conditions of employment. The District had not transferred or reassigned teachers for the past ten years. ¶ 7. The zipper clause could be interpreted to waive BEA's right to bargain for teacher transfers or reassignments. The CBA simultaneously protected teachers from unilateral changes to conditions that concerned professional advantages. The expertise and education acquired over years of teaching the same subject could be interpreted to constitute a protected professional advantage.

¶41    The CBA, read as a whole, does not reveal conclusively whether the zipper clause waived BEA's right to bargain for teacher transfers. Likewise, the CBA does not reveal whether the professional advantages clause specifically protected teachers from unilateral transfers or reassignments. The CBA's conflicting provisions lend themselves to more than one meaning. The CBA is ambiguous as a matter of law. *See Mary J. Baker Revoc. Trust v. Cenex Harvest*, 2007 MT 159, ¶¶ 20-21, 338 Mont. 41, ¶¶ 20-21, 164 P.3d 851, ¶¶ 20-21.

¶42    Section 39-31-305(1), MCA, provides that it is the duty of a public employer to bargain in good faith. The statutory duty to bargain includes a duty to bargain as to "any question arising" under the CBA. Section 39-31-305(1), MCA. Ambiguity in the zipper

16

clause and the professional advantages clause constitutes a "question arising" under the CBA. The CBA provides no clear mechanism to resolve the correct interpretation of those competing provisions. Section 39-31-401(5), MCA, provides that it is an unfair labor practice to refuse to bargain collectively in good faith.

¶43    The District overstates the concern that to require collective bargaining for teacher transfers would defeat its expressly reserved management right under the CBA. To require collective bargaining on a subject, in fact, has no effect on the employer's fundamental right to manage and operate. Collective bargaining does not impose on management the duty to concede to union demands. Collective bargaining merely means, under Montana law, "to meet at reasonable times and negotiate in good faith . . . ." Section 39-31-305(2), MCA. It obligates the employer to no particular outcome. It merely obligates the employer to participate in good faith in the actual collective bargaining process.

¶44    We note that bargaining also promotes the purpose of the Montana Collective Bargaining for Public Employees Act to "remove[] certain recognized sources of strife and unrest" and "arrive at friendly adjustment of all disputes between public employers and their employees." Section 39-31-101, MCA. Similarly, Congress, in its statement of policy goals for the NLRA, emphasized that "[t]he denial by some employers of the right of employees to organize and the refusal by some employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest . . . ." 29 U.S.C. § 151. Collective bargaining provides a process that places little actual burden on the employer, but can do so much to "defuse[] and channel[] conflict between labor and management." *First National Maintenance*, 452 U.S. at 674, 101 S. Ct. at 2578. We determine that the District

17

committed an unfair labor practice when it refused to bargain in good faith for teacher transfers and assignments, in light of the ambiguity in the CBA created by the competing provisions of the zipper clause and the professional advantages clause.

¶45    *Whether the District Court properly remanded to the Hearings Officer the question of whether a long-standing practice should be treated as an express provision of a collective bargaining agreement.*

¶46    BEA argues on appeal that the District Court improperly remanded to the Hearings Officer the issue of whether the District's long-standing practice of not unilaterally transferring teachers required it to bargain for teacher transfers. We need not address this issue because we have held that both the Montana Collective Bargaining for Public Employees Act and the CBA require the District to bargain.

¶47    Reversed.

/S/ BRIAN MORRIS


We Concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE